IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Felicia Dorenda Palmer, | ) | C/A No.: 1:13-1622-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the order of the Honorable J. Michelle Childs dated July 16, 2013, referring this matter for disposition.    [Entry #6].    The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").  The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards.  For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

  A.    Procedural History

On January 27, 2010, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on December 31, 2009.  Tr. at 98, 100.  Her applications were denied initially and upon reconsideration.  Tr. at 102–06, 112–13, 114–15.  On February 3, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Frances W. Williams.  Tr. at 28–78 (Hr'g Tr.).  The ALJ issued an unfavorable decision on March 9, 2012, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 7–25.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 13, 2013.  [Entry #1].

  B.    Plaintiff's Background and Medical History

    1.    Background

Plaintiff was 48 years old at the time of the hearing.  Tr. at 32.  She completed the tenth grade.  Tr. at 33.  Her past relevant work ("PRW") was as a cashier, a custodian, a custodial supervisor, a sandwich maker, a garment folder, and a daycare worker.  Tr. at 72.  She alleges she has been unable to work since December 31, 2009.  Tr. at 36.

    2.    Medical History

Plaintiff underwent multiple surgeries to her bilateral knees prior to the alleged onset date of disability.  On January 5, 2006, Plaintiff underwent arthroscopic partial medial meniscectomy of the right knee, arthroscopic excision of the synovial plica, and

arthroscopic abrasion chrondroplasty of the medial femoral condyle. Tr. at 275–76. Plaintiff underwent arthroscopic osteochondral autograft transplantation and partial medial meniscectomy of the left knee on July 11, 2006. Tr. at 278–79. On March 18, 2008, Plaintiff underwent arthroscopic lysis of adhesions of the left knee medial capsule and abrasion chondroplasty of the trochlear groove. Tr. at 308.

Also prior to the alleged onset date, Plaintiff complained of right shoulder pain. On November 20, 2008, Plaintiff followed up with Dr. Thomas Ewart for right shoulder pain and MRI results. Tr. at 301. Dr. Ewart reviewed the MRI and concluded that Plaintiff had a supraspinatus tear and some labral degeneration. *Id.* After conservative treatment for the right shoulder failed, Plaintiff was scheduled for right shoulder subacromial decompression, Mumford resection, and rotator cuff repair on October 8, 2009. Tr. at 395. However, on October 13, 2009, Plaintiff informed Dr. Ewart that she cancelled her right shoulder surgery due to having the flu and that she could not reschedule the surgery because she had to work. Tr. at 394. Dr. Ewart observed restricted motion in Plaintiff's right shoulder with abduction reduced to 110 degrees and internal and external rotation reduced to 60 degrees. *Id.*

Plaintiff also complained of neck pain before her alleged onset date. On October 28, 2009, Plaintiff presented to Dr. Ewart with complaint of neck pain. Tr. at 393. Dr. Ewart observed no acute impairment and advised Plaintiff of possible treatment. *Id.* X-ray of the cervical spine on November 5, 2009, indicated mild spondylolytic changes at C4-5 and C5-6. Tr. at 442.

Plaintiff complained of increased left knee pain in the fall of 2009. MRI of the left knee on November 10, 2009, revealed moderate degenerative arthrosis changes of the medial compartment with a degenerative horizontal tear of the posterior and medial horns of the medial meniscus and a moderate-sized joint effusion with multiple thin internal septations. Tr. at 289.

On her alleged onset date of December 31, 2009, Plaintiff underwent arthroscopic partial medial meniscectomy of the left knee, which was performed by Dr. Ewart. Tr. at 346–47.

On March 11, 2010, Plaintiff presented to her primary care physician Beena Varugheses, M.D., for follow up regarding hypertension and diabetes mellitus. Tr. at 384–85. Plaintiff complained of moderate left knee pain and blurred vision. Tr. at 384. Plaintiff's blood sugar and hypertension were noted to be well-controlled. Tr. at 385.

Plaintiff followed up with Dr. Ewart on March 16, 2010. Tr. at 388. Dr. Ewart indicated that he could do nothing else for Plaintiff because injections had not helped and Plaintiff was too young for joint replacement. *Id.* He recommended that Plaintiff "not take any job that requires standing and walking due to severe arthritis in the knee." *Id.* He referred Plaintiff to Deanna Constable, M.D. *Id.*

On March 18, 2010, Plaintiff followed up with Dr. Varugheses. Tr. at 484–86. She complained of intermittent episode of pain in the right parietal scalp area and left knee pain. Tr. at 484. Plaintiff reported that she lost her job because her employer could not comply with her light duty restriction. *Id.* Plaintiff indicated that she had applied for social security. *Id.*

4

Dr. Constable examined Plaintiff on April 15, 2010. Tr. at 436. She administered a Euflexxa knee injection and indicated that Plaintiff may benefit from a partial knee replacement. *Id.* Plaintiff received additional Euflexxa injections on April 22 and 29, 2010. Tr. at 438–39.

Plaintiff complained of headaches to Dr. Varugheses on June 22, 2010, and Dr. Varugheses referred her for CT scan. Tr. at 490–94. CT of the head on June 23, 2010, was normal. Tr. at 441.

On July 8, 2010, state agency consultant James Haynes, M.D., completed a physical residual functional capacity assessment. Tr. at 443–50. Dr. Haynes indicated that Plaintiff was restricted as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push and/or pull unlimited; occasional climbing of ramp/stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladder/rope/scaffolds; occasional overhead reaching with the right shoulder; and avoid concentrated exposure to hazards (machinery, heights, etc), fumes, odors, dusts, gases, poor ventilation, etc. Tr. at 444–47.

On August 13, 2010, Plaintiff presented to orthopedic surgeon Frank Voss, M.D. Tr. at 451–52. Plaintiff indicated that she experienced numbness in her left leg that went down the medial side of the leg to the ankle. Tr. at 451. Dr. Voss concluded that Plaintiff had mild degenerative changes and possible osteonecrosis of the femoral condyle. Tr. at 452. He did not recommend total knee replacement because of Plaintiff's age, size, and the fact that her knees were not bone-on-bone due to arthritis. *Id.* Dr. Voss

recommended that Plaintiff wear a knee brace and lose 100 pounds or more.  *Id.*  He did note, however, that if Plaintiff had osteonecrosis of the medial femoral condyle, total knee arthroplasty may be the correct course of action.  *Id.*

Plaintiff followed up with Dr. Constable on September 10, 2010, who indicated that she agreed with Dr. Voss.  Tr. at 455.  Dr. Constable indicated that Plaintiff "has significant difficulty maintaining a functional level of employment." *Id.*  She specifically indicated that "her knees will limit her from any significant walking, squatting, stooping, or stair climbing type activities."  *Id.*  Plaintiff was instructed to return as needed.  *Id.*

On October 14, 2010, Plaintiff complained of depression to Dr. Varugheses.  Tr. at 502.  Plaintiff indicated that she was having problems with debt collectors because of her inability to work and that she was upset because her son was recently arrested.  *Id.*  She endorsed symptoms that included difficulty sleeping, overeating, concentration problems, short temper, and crying all the time.  Tr. at 502–03.  Plaintiff requested medication for her depression.  Tr. at 502.  Dr. Varugheses prescribed Prozac.  Tr. at 504.

On November 22, 2010, Dr. Constable completed a form for Plaintiff to obtain a disabled placard and license plate.  Tr. at 473.  Dr. Constable checked boxes that indicated that Plaintiff had "an inability to ordinarily walk one hundred feet nonstop without aggravating medical condition, including the increase of pain" and "an inability to ordinarily walk without the use of, or assistance from a brace, cane, crutch, another person, prosthetic device, wheelchair, or other assistive device."  *Id.*  Dr. Constable also checked a box that indicated that the disability was permanent.  *Id.*

6

Plaintiff followed up with Dr. Varugheses on November 30, 2010.  Tr. at 506–09. Plaintiff reported increased blood pressure, but denied symptoms of depression.  Tr. at 506.

On December 15, 2010, state agency consultant James Weston, M.D. completed a physical residual functional capacity assessment in which he indicated that Plaintiff was restricted as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; occasionally push and/or pull with foot pedals using the left lower extremity; frequently balancing; occasionally climbing ramp/stairs, stooping, kneeling, crouching, and crawling; and never climbing ladder/rope/scaffolds.  Tr. at 475–82.

On January 18, 2011, Plaintiff presented to Jandrette E. Rhoe, M.D., to establish treatment.  Tr. at 569–70.  Plaintiff complained of back and rib pain and blood in her urine, dysuria, and urinary frequency.  Tr. at 569.  Dr. Rhoe noted that Plaintiff had a limping gait and that she ambulated with a left knee brace.  Tr. at 570.

Plaintiff followed up with Dr. Ewart on January 19, 2011.  Tr. at 513–14.  Plaintiff indicated that she experienced some improvement and was falling less when using the unloader brace prescribed by Dr. Constable.  Tr. at 513.  She complained of pain in her neck and shoulder.  *Id.*  Dr. Ewart observed painful range of motion of both the shoulder and neck and positive impingement test of the right shoulder.  *Id.*  Dr. Ewart recommended conservative treatment for the shoulder and neck.  Tr. at 514.

Plaintiff followed up with Dr. Rhoe on April 18, 2011, with complaints of left knee pain, back pain, and itching. Tr. at 565–66. Dr. Rhoe noted that Plaintiff was depressed because she had limited movement and could not do the things she used to do. Tr. at 565. She was prescribed a cream for her rash and Amitriptyline for pain and referred to Dr. Rodgers for depression. Tr. at 566.

On May 31, 2011, Plaintiff complained to Dr. Rhoe that her knee pain was worsening. Tr. at 572. Plaintiff indicated that the pain in her left knee felt like bone-on-bone. *Id.* Plaintiff complained of increased pain, swelling, and warmth in her right knee. *Id.*

On June 4, 2011, Plaintiff presented to the emergency room at Palmetto Health Richland after sustaining a fall while walking down stairs. Tr. at 519–61. X-ray of the right knee indicated only mild degenerative change in the medial compartment. Tr. at 535. X-ray of the left knee indicated moderate to severe two compartment degenerative change. Tr. at 536. X-ray of the lumbar spine showed no acute osseous injury. Tr. at 537. Plaintiff had limited active motion of the bilateral lower extremities. Tr. at 549.

Plaintiff followed up with Dr. Rhoe on June 16, 2011, for knee pain, back pain, and blood in her urine. Tr. at 563–64. Plaintiff's blood pressure medication was changed, but all other medications remained the same. Tr. at 564. Plaintiff was noted to be ambulating with a cane and to be non-insulin dependent. *Id.*

X-ray of the left knee on August 22, 2011, indicated left medial compartment and patellofemoral arthritis. Tr. at 576.

X-ray of the right shoulder on August 23, 2011, indicated mild narrowing of the AC joint. Tr. at 577.

On August 31, 2011, Dr. Rhoe wrote a letter on Plaintiff's behalf, which was addressed to the social security office. Tr. at 578. Dr. Rhoe indicated that Plaintiff had multiple knee surgeries and right shoulder surgery and that she suffered from severe degenerative arthritis in the knees that did not allow her to stand for any significant length of time and caused her considerable pain. *Id.* Dr. Rhoe wrote that Plaintiff was not a candidate for knee replacement and that her symptoms would only worsen. *Id.* She indicated that Plaintiff wore a left knee brace to avoid falls. *Id.* Finally, she wrote that Plaintiff "cannot work given her existing condition." *Id.* The record also contains an undated letter from Dr. Rhoe, which indicates that Plaintiff "has significant medical conditions that affect her ability to work." Tr. at 515. Dr. Rhoe noted many of the same impairments set forth above, but also noted that Plaintiff ambulated with a left metal knee brace and a cane. *Id.* Dr. Rhoe wrote that Plaintiff "suffers from pain issues as well as physical limitations." *Id.*

On September 15, 2011, Plaintiff presented to the emergency department at Palmetto Health Richland with complaint of rib pain after sustaining a fall. Tr. at 580–84. Plaintiff reported that she fell frequently, even when using her brace and cane. Tr. at 581. Plaintiff was noted to walk slowly with her cane and to be somewhat unsteady on her feet, but she was not observed to be in any pain when walking. Tr. at 582.

C.    The Administrative Proceedings

      1.    The Administrative Hearing

            a.    Plaintiff's Testimony

At the hearing on February 3, 2012, Plaintiff testified that she had difficulty climbing the steps in front of her home. Tr. at 32. She indicated that she had a driver's license, but that she had difficulty driving more than 15 miles. Tr. at 33. Plaintiff testified that she was in regular classes in school. Tr. at 34. She testified that she was able to read and write. *Id.*

Plaintiff testified that she stopped working on December 30, 2009, because she had knee surgery. Tr. at 36. She indicated that she was released to perform light duty, but that her employer had no light duty jobs. *Id.* Plaintiff indicated that she had looked for work and that she had collected unemployment until approximately a week-and-a-half before the hearing. Tr. at 37.

Plaintiff testified that she last worked as a custodian supervisor at Service Solutions for about ten years. Tr. at 39–40. Plaintiff indicated that she previously worked as a school custodian. Tr. at 41. Plaintiff testified that she worked as a sandwich maker at Heavenly Ham while working as a school custodian. Tr. at 42–43. She indicated that she had a temporary job in a textile mill, where she was folding clothes and stocking. Tr. at 44. Plaintiff testified that she worked as a custodian for Southeastern Service Corp. *Id.* Plaintiff indicated that she also worked as a daycare worker. Tr. at 45.

Plaintiff testified that in her job as custodian supervisor, she set work schedules, kept time records, and sometimes fired employees. Tr. at 46.

Plaintiff testified that knee pain prevented her from sitting or standing for too long. Tr. at 47. Plaintiff indicated that she had pain in her right shoulder, which increased when she lifted her arms and when she clapped. *Id.* Plaintiff testified that the fingers on her right hand went numb. *Id.* Plaintiff indicated that she had neck pain and headaches. *Id.* Plaintiff testified that she was an insulin-dependent diabetic. *Id.* Plaintiff indicated that her vision was blurred due to diabetes. Tr. at 48. She testified that she was depressed. *Id.* Plaintiff testified that she had a bone spur in her right foot, which caused swelling and pain when walking and standing for over 30 minutes at a time. Tr. at 51.

Plaintiff testified that she received treatment from her family physician, Dr. Rhoe, and that she had been seeing Dr. Rhoe for six months to a year. Tr. at 48. Plaintiff testified that she had previously seen Dr. Varugheses, but that Dr. Varugheses had moved to another practice. Tr. at 53. Plaintiff indicated that she had not visited a mental health clinic because she could not afford it. *Id.*

Plaintiff testified that she always used a cane to stand and walk. Tr. at 53–54. Plaintiff also indicated that she wore a brace on her left knee. Tr. at 54.

Plaintiff testified that she was able to wash some dishes, make her bed, and check her post office box. Tr. at 57. Plaintiff indicated that she was able to prepare meals by sitting on a stool. Tr. at 58. Plaintiff testified that she attended church two days per week. Tr. at 59. Plaintiff indicated that her mother lived half-a-mile away and that she visited her regularly. Tr. at 60. Plaintiff testified that she traveled to Wal-Mart with her sisters or mother, but that they did the shopping for her because she could not walk to perform her shopping. *Id.* Plaintiff indicated that she was able to wash and dry her

clothes.  Tr. at 69.  Plaintiff testified that she could bathe and dress herself, but that she had some difficulty tying her shoes and lifting her knee to get into the tub.  *Id.*

Plaintiff testified that blurred vision may be caused by her medications, but denied having any other side effects from medications.  Tr.at 61–62.  Plaintiff testified that she had some difficulty focusing because of depression.  Tr. at 63.

Plaintiff testified that she could sit for about an hour before experiencing problems.  Tr. at 64.

The ALJ asked Plaintiff if she always either went to the emergency room or told her doctor when she fell.  Tr. at 66.  Plaintiff indicated that she did.  *Id.*

Plaintiff testified that she watched television and used a computer.  Tr. at 69.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Robert E. Brabham, Jr., reviewed the record and testified at the hearing.  Tr. at 71–76.  The VE categorized Plaintiff's PRW as a cashier, which was light with a SVP of 3 and a DOT number of 211.462-014; a custodian, which was medium with a SVP of 3 and a DOT number of 382.664-010; a custodial supervisor, which was medium with a SVP of 6 and a DOT number of 381.137-010; a sandwich maker, which was light with a SVP of 2 and a DOT number of 317.664-010; a garment folder, which was light with a SVP of 2 and a DOT number of 789.687-066; and a daycare worker, which was light with a SVP of 4 and a DOT number of 359.677-018.  Tr. at 72.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and carry a maximum of 20 pounds occasionally and 10 pounds frequently; could stand and walk no more than two hours out of an eight-hour workday;

would need to stand for a few minutes at the work station after one hour of sitting; could not walk on uneven terrain; should only occasionally stoop, crouch, climb stairs or ramps, balance, work overhead with the right upper extremity, and use right lower extremity controls; could not kneel or climb ladders, ropes, or scaffolds; could not crawl; could not operate controls with the left lower extremity; and could not work at unprotected heights. Tr. at 73. The VE testified that the hypothetical individual could not perform Plaintiff's past jobs. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified sedentary, unskilled jobs as an assembler, DOT number 739.684-094, with 1,000 positions in the local economy and over 38,000 positions in the national economy; an order clerk, DOT number 209.567-014, with 500 positions in the local economy and 20,000 positions nationally; and an addresser, DOT number 209.587-010, with 500 positions in the local economy and over 21,000 positions nationally. Tr. at 74. The ALJ proposed a second hypothetical in which she asked the VE to assume that the individual would be limited to lifting and carrying 10 pounds occasionally and less than 10 pounds frequently, would require a cane when walking, and would have additional restrictions as set forth in the first hypothetical. Tr. at 75. The VE testified that the individual could perform the jobs identified in response to the first hypothetical. Tr. at 76. The ALJ then asked the VE to assume that the individual would be required to use a cane when walking and standing and would need to elevate her feet at stool level on an occasional basis. *Id.* The VE responded that, if the individual needed to stand on a regular basis and to use the

cane when standing, it would eliminate the individual's ability to use one hand, which eliminates employment at the sedentary exertional level. *Id.*

Plaintiff's attorney declined to question the VE. *Id.*

### 2.    The ALJ's Findings

In her decision dated March 9, 2012, the ALJ made the following findings of fact and conclusions of law.

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
2.  The claimant has not engaged in substantial gainful activity since December 31, 2009, the alleged onset date (20 C.F.R. §§ 404.1521 *et seq.*, and 416.971 *et seq.*)
3.  The claimant has the following severe impairments: osteoarthritis of the knees, left worse than right; right shoulder rotator cuff tear; a right heel spur; and obesity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).
5.  After careful consideration of the entire record, I find that the claimant has the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except while she can lift up to ten pounds occasionally and less than ten pounds frequently, and stand and/or walk two hours in [an] eight-hour workday, she has additional limitations including that she needs the opportunity to stand at her work station after one hour of sitting.  She requires a cane while walking, but not when standing.  She cannot walk on uneven terrain.  She may occasionally stoop, crouch, use stairs or ramps, and balance.  She may not knee[l], crawl, or climb ladders, ropes, or scaffolds.  She can occasionally reach overhead with her right upper extremity.  She may not operate foot controls with her leg [sic] lower extremity, but may operate them occasionally with her right.  She cannot work around unprotected heights.
6.  The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).
7.  The claimant was born on June 6, 1963 and was 46 years old, which is defined as a younger individual age 45–49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).
8.  The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

Tr. at 7–25.

D.      Appeals Council Review

Plaintiff filed a request for review of the Administrative Law Judge's decision on March 9, 2012. Tr. at 6. On May 2, 2013, the Appeals Council denied the request for review. Tr. at 1–3.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      The ALJ did not properly evaluate Plaintiff's physical and mental impairments, specifically osteoarthritis of the knees, right shoulder rotator cuff tear, right heel spur, and obesity, in order to determine if Plaintiff's impairments met or equaled Listing 1.02 or 1.03;

2)      The ALJ did not properly evaluate Plaintiff's subjective complaints of pain; and

3)      The ALJ did not properly evaluate Dr. Rhoe's medical statement.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

15

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v.*

---

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

        2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Evaluation of Impairments Under Listings 1.02 and 1.03

Plaintiff argues that the ALJ erred in failing to consider Plaintiff's severe and non-severe impairments in combination when determining that the impairments did not meet the listed impairments.  Tr. at 2–7.  The Commissioner counters that the ALJ provided substantial reasons for concluding that Plaintiff could ambulate effectively and for determining that Plaintiff's impairments did not meet or equal a listed impairment. [Entry #20 at 8–12].

At step three of the sequential evaluation, the Commissioner must determine whether the claimant has an impairment that meets or equals the requirements of one of the impairments listed in the regulations and is therefore presumptively disabled.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added).  It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment.  20 C.F.R. § 404.1525(d).  The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment.  20 C.F.R. § 404.1508.  The Commissioner can also determine that the claimant's impairments are medically equivalent to a Listing, which occurs when an impairment is at least equal in severity and duration to the criteria of a Listing.  20 C.F.R.

19

§ 404.1526(a).  There are three ways to establish medical equivalence: (1) if the claimant has an impairment found in the Listings, but does not exhibit one or more of the findings specified in the particular Listing or one of the findings is not as severe as specified in the particular Listing, then equivalence will be found if the claimant has other findings related to the listed impairment that are at least of equal medical significance to the required criteria; (2) if the claimant has an impairment not described in the Listings, but the findings related to the impairment are at least of equal medical significance to those of a particular Listing; or (3) if the claimant has a combination of impairments and no singular impairment meets a particular Listing, but the findings related to the impairments are at least of equal medical significance to those of a Listing.  20 C.F.R. § 404.1526(b).

When a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status.  *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments).  The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B).  The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them."  *Walker*, 889 F.2d at 50.  "As a

corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

Plaintiff argues that the ALJ erred by failing to properly consider whether the combined effects of claimant's impairments met or were medically equal to the requirements of Listings 1.02 and 1.03. [Entry #15 at 6–7].

Listing 1.02 provides in pertinent part:

1.02 Major Dysfunction of a joint(s) (due to any cause):
Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §1.02.

Listing 1.03 provides:

1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §1.03.

"Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §1.00B2b(1). The Listing goes on to state that "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit

independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.  *Id.*

> Listing 1.00B2b(2) provides:
>
> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail . . . .

20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §1.00B2b(2).

After identifying the proper Listing criteria, the ALJ should "compare[ ] each of the listed criteria to the evidence of [Plaintiff's] symptoms."  *Cook*, 783 F.2d at 1173. *Cook v. Heckler*, however, "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases."  *Russell v. Chater*, 60 F.3d 824, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (Table).  Rather, courts in the Fourth Circuit have found that a "point-by-point" analysis is required when, "there is 'ample factual support in the record' for a particular listing."  *Beckman v. Apfel*, C/A No. 99–3696, 2000 WL 1916316, at *9 (D. Md. Dec.15, 2000).

Plaintiff argues that the ALJ erred in concluding that Plaintiff was capable of ambulating effectively because Plaintiff used a cane to ambulate and because the record suggests that Plaintiff sustained frequent falls.  Tr. at 6–7.

The ALJ explicitly considered and rejected Listing 1.02, finding that "[t]he weight of the evidence shows that claimant is capable of ambulating effectively and performing

fine and gross manipulations (as defined in the [L]isting) despite her musculoskeletal difficulties and the use of a cane."  Tr. at 13.  To support this conclusion, the ALJ indicated that the record only shows "a few falls over the course of several years."  Tr. at 17.  The ALJ noted that Plaintiff indicated to her physician that the unloader brace decreased the frequency of her falls.  *Id.*  The ALJ determined that Plaintiff's conditions may not be as limiting as Plaintiff suggests because Plaintiff had problems with her left knee that required two surgeries prior to the December 31, 2009, surgery and continued to work.  *Id.*  The ALJ noted that Plaintiff's impairments have not substantially changed since prior to her alleged onset. date.  *Id.*

The undersigned finds that the ALJ properly weighed the evidence and concluded that Plaintiff was capable of ambulating effectively and that her impairments did not meet Listings 1.02 or 1.03.  In the over two years between Plaintiff's alleged onset date and her hearing date, Plaintiff presented to the emergency room twice after sustaining falls, on June 4, 2011, and September 15, 2011.  Tr. at 519–61, 580–84.  The medical records repeatedly indicated that Plaintiff ambulated with a cane, not "a hand-held assistive device(s) that limits the functioning of both upper extremities," such as two crutches, two canes, or a walker as specified in Listing 1.00B2b.  Furthermore, none of Plaintiff's physicians prescribed or suggested use of devices other than the cane and knee immobilizer brace.  While Plaintiff did testify that she had frequent falls, she also testified that she told her doctor or visited the emergency room every time she fell.  Tr. at 66.  While the medical records contain some indications that Plaintiff experienced falls, the records are unclear as to the frequency of the falls and the circumstances surrounding

the falls.  The undersigned acknowledges that the record contains conflicting evidence regarding Plaintiff's falls, but determines that the ALJ properly weighed that evidence and reached a conclusion that was supported by substantial evidence.

The undersigned also finds that the ALJ properly determined that Plaintiff's combination of impairments were not medically equal to a Listing.  Because Plaintiff had evidence of major dysfunction of a peripheral weight-bearing joint and evidence of reconstructive surgery of a major weight-bearing joint, the ALJ would have had to determine that other findings related to her impairment were at least of medical significance to the required criteria under Listings 1.02 and 1.03 in order to determine that her impairments medically equaled the Listings.  For example, a finding of medical equivalence would be supported if Plaintiff were unable to use the bilateral upper extremities.  While Plaintiff has a right shoulder rotator cuff tear, the record contains no evidence that the rotator cuff tear significantly limits her ability to use her right upper extremity to utilize a cane, crutch, or walker.  Where, as here, there is no evidence of other impairments of medical significance to Plaintiff's ability to ambulate effectively, medical equivalence to a Listing is not supported.

The undersigned concludes that the ALJ adequately explained her evaluation of the combined effects of Plaintiff's impairments.  She concluded that the medical records indicated that osteoarthritis of the knees (left worse than right), right shoulder rotator cuff tear, right heel spur, and obesity were impairments that "significantly limited the claimant's ability to perform basic work activities."  Tr. at 13.  The ALJ concluded that diabetes, neck pain, high blood pressure, and asthma did not produce more than minimal

work-related limitations. *Id.* In determining the severity of and limitations imposed by Plaintiff's impairments, the ALJ thoroughly discussed Plaintiff's medical records, the objective findings of her physicians, the diagnostic testing, and the opinions rendered.

The undersigned rejects Plaintiff's argument that the ALJ erred in failing to consider Listing 1.03. The record indicates that Plaintiff did undergo three surgeries to her left knee and one to her right knee. However, Listing 1.03 contains the same requirement as Listing 1.02 that an individual must have the "inability to ambulate effectively." Therefore, because the ALJ concluded that Plaintiff was able to ambulate effectively when considering Listing 1.02, the undersigned concludes that she would have reached the same determination regarding Listing 1.03. Therefore, the ALJ's failure to note that she considered Listing 1.03 is harmless error.

### 2.    Evaluation of Credibility and Symptoms of Pain

Plaintiff argues that the ALJ erred in finding that Plaintiff lacked credibility because her testimony and subjective complaints of pain were inconsistent with the RFC assessment. Tr. at 7–8. Plaintiff also argues that the ALJ's conclusion that Plaintiff's condition did not worsen after December 31, 2009, was not consistent with the record. Tr. at 8. The Commissioner argues that the ALJ adequately assessed Plaintiff's credibility and provided sufficient support for her findings. Tr. at 12–13.

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. § 404.1529; SSR 96-7p; *Craig*, 76 F.3d

585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76 F.3d at 594 (internal quotation omitted). Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595. This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p.

If an ALJ rejects a claimant's testimony about his pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the

location, duration, frequency, and intensity of the individual's pain or other symptoms;

factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and

side effects of any medication the individual takes or has taken to alleviate pain or other

symptoms; treatment, other than medication, the individual receives or has received for

relief of pain or other symptoms; any measures other than treatment the individual uses to

relieve pain or other symptoms; and any other factors concerning the individual's

functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

The ALJ weighed Plaintiff's subjective complaints.  She noted Plaintiff's

testimony in which she declared that she suffered from chronic pain and was significantly

limited in performing daily activities.  Tr. at 14.  She examined Plaintiff's claim of

frequent falls.  Tr. at 17.  She considered Plaintiff's allegation that her condition

worsened after December 31, 2009.  *Id.*

The ALJ considered the objective evidence in determining Plaintiff's credibility.

The ALJ noted that "her right knee and shoulder have much less serious findings on the

most recent medical imaging, suggesting Dr. Ewart's treatment was effective."  Tr. at 17.

The ALJ also indicated that the "records only documented a few falls over the course of

several years."  *Id.*  The ALJ considered that Plaintiff's impairments predated her alleged

onset date by several years, during which she continued to work.  *Id.*  The ALJ

interpreted this to suggest that Plaintiff's impairments were not as limiting as she alleged.

*Id.*

The ALJ also considered the opinion evidence.  The ALJ noted that the RFC

identified in her decision was consistent with the opinions rendered by Drs. Ewart and

Constable. Tr.at 18. The ALJ also acknowledged that the RFC was consistent with the state agency consultants' assessments and with a functional capacity evaluation referenced by Dr. Ewart. *Id.* The ALJ considered and rejected the opinion of Dr. Rhoe, finding it to be conclusory, without support, and unclear. *Id.*

The undersigned finds that the ALJ properly assessed Plaintiff's credibility and symptoms of pain. The ALJ provided a reasoned explanation for her findings. She identified Plaintiff's bilateral knee pain as an impairment that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. The ALJ then considered the record as a whole to evaluate the intensity and persistence of Plaintiff's pain and the extent to which it affected her ability to work. The ALJ considered and explained Plaintiff's subjective complaints, the objective evidence, and the medical opinions in the record. After considering the entire record, the ALJ reached a conclusion regarding Plaintiff's credibility and symptoms of pain that was supported by substantial evidence.

### 3.    Treating Physician's Opinion

Plaintiff alleges that the ALJ did not properly evaluate Dr. Rhoe's medical statement. Tr. at 8–9. The Commissioner argues that Dr. Rhoe's opinion was an opinion on an issue reserved to the Commissioner and was not supported by Dr. Rhoe's treatment notes. Tr. at 13–15.

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will

28

be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).  However, "[o]pinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d).  "Opinions that you are disabled" are among those reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(1).  The law does not give "any special significance to the source of an opinion on issues reserved to the Commissioner."  20 C.F.R. § 404.1527(d)(3).  "[A] treating physician's opinion is only entitled to such . . . deference when it is a medical opinion." *Curler v. Comm'r of Soc. Sec.*, ---- Fed. Appx. ----, 2014 WL 1282521, at *6 (6th Cir. April 1, 2014) *citing Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 492–93.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors—his decision need only 'explain the consideration given to the treating source's opinion.'"  *Id. citing Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (quoting SSR 96-5p).

"The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination of disability, including opinions from medical

sources about issues reserved to the Commissioner." SSR 96-5p. "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. *Id.*

Plaintiff's primary care physician, Dr. Rhoe, wrote two letters regarding Plaintiff's impairments that were direct to social security. Tr. at 515, 578. One letter is undated and the other is dated August 31, 2011. *Id.* In each letter, Dr. Rhoe recited some of Plaintiff's impairments, noted that she could not stand for long and used assistive devices to ambulate, and indicated that Plaintiff suffered from pain. *Id.* In the letter dated August 31, 2011, Dr. Rhoe wrote that Plaintiff "cannot work given her existing condition." Tr. at 578.

The ALJ indicated that she gave "little weight" to Dr. Rhoe's suggestion that Plaintiff "cannot work" because it was a conclusory statement that was not provided in functional terms. Tr. at 18. The ALJ further explained that Dr. Rhoe's letter failed to state the conditions for which she treated Plaintiff. *Id.* The ALJ also determined that it was not clear from the statement whether it was a medical opinion or a recitation of Plaintiff's allegations. *Id.* The ALJ also discussed the medical opinions from Drs. Ewart and Constable, which indicated that Plaintiff was limited in her abilities to stand and walk, but never suggested that she was completely precluded from working in any capacity. *Id.*

Plaintiff points out that the ALJ erroneously indicated that Dr. Rhoe had previously advised Plaintiff that she should obtain a disability statement from her

orthopedist.  *Id.*  Plaintiff previously treated with Dr. Varugheses in the same office, and while Dr. Varugheses did suggest to Plaintiff that she obtain a statement from her orthopedist, the records reflect no such statement from Dr. Rhoe.

The undersigned concludes that Dr. Rhoe's statement was an opinion on an issue reserved to the Commissioner, and that the ALJ's decision to give that statement little weight was supported by substantial evidence.  Dr. Rhoe's statement recited Plaintiff's orthopedic impairments, but failed to cite any of the impairments for which Dr. Rhoe provided treatment.  Dr. Rhoe's statement also indicated a greater level of restriction than those endorsed by the orthopedists who treated Plaintiff, but provided no reason to support greater restrictions.  Additionally, Dr. Rhoe's statement does not contain any functional limitations, but is instead a blanket statement that Plaintiff "cannot work," which could either be an opinion or an assessment of Plaintiff's self-reported limitations. While the ALJ erred in indicating that Dr. Rhoe encouraged Plaintiff to obtain a statement from her orthopedist, this is harmless error in light of the fact that substantial evidence supports the weight the ALJ accorded to Dr. Rhoe's statement.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

August 5, 2014                              Shiva V. Hodges
Columbia, South Carolina            United States Magistrate Judge

31